IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOANNA TOSINSKI,**                    Case No. 1:17 CV 198

      Plaintiff,

      v.                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                    MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Joanna Tosinski ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2014, alleging a disability onset date of July 29, 2013. (Tr. 158-59). Her claims were denied initially and upon reconsideration. (Tr. 102-04, 106-08). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 111). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 11, 2016. (Tr. 31-81). On February 2, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 16-26). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on January 31, 2017. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background</u>

Plaintiff was born in June 1973, making her forty years old on her alleged onset date. *See* Tr. 158. She had a high school education (Tr. 186), and past relevant work as a mortgage loan processor, doctor's receptionist, and medical assistant (Tr. 71, 186). Plaintiff alleged disability due to arthritis, multiple left leg surgeries, and a hip replacement. (Tr. 185).

<u>Relevant Medical Evidence</u>

In April 2013, Plaintiff saw Jamile Wakim-Fleming, M.D. (Tr. 231-34). Dr. Wakim-Fleming noted Plaintiff had a left hip infection as a child and subsequently had multiple hip surgeries. (Tr. 232). A medical assistant noted no concerns for physical safety or falls, or difficulty performing routine daily living activities. (Tr. 234).

In July 2013, Plaintiff first saw orthopedic surgeon Michael Joyce, M.D., and Nicole Moskal, P.A.-C. (Tr. 239-43). Plaintiff reported her history of left hip surgeries as a child, and noted she "has always had pain in her left hip but in the last 6 months it has started becoming unbearable." (Tr. 239). After an examination, and review of x-rays, Dr. Joyce noted Plaintiff planned to consider proceeding with a hip reconstruction in September 2013. (Tr. 243).

Plaintiff underwent a physical with Irene Dejak, M.D., in August 2013. (Tr. 453-55). She reported she was exercising on a treadmill, although she was limited by left hip pain and planned to have a hip replacement. (Tr. 453).

In September 2013, Plaintiff underwent a total left hip replacement. (Tr. 225-27, 249-53). During the surgery, she had "[r]emoval of two screws in the greater trochanter with removal of

2

hardware for exposure and removal of buried plate/femoral head screen covered by bone from childhood." (Tr. 225). Her postoperative diagnosis was congenital dislocation of hip / multiple operations of proximal trochanteric osteotomy in the past. *Id.*

Plaintiff followed-up with Dr. Joyce in October 2013. (Tr. 257-58). She was "progressing well" with "[m]inimal to no pain at rest" and "moderate pain with exercise, relieved by pain medication". (Tr. 257). An x-ray the same day showed the hip replacement "with bone graft placement", that the "lateral struts and multiple cerclage wires [were] unchanged in alignment", moderate degenerative change of public symphysis was unchanged, and deformity of the left iliac bone was chronic. (Tr. 289). Dr. Joyce referred Plaintiff to physical therapy. (Tr. 257).

In January 2014, Plaintiff returned to Dr. Joyce's office. (Tr. 261). The physician's assistant, Ms. Moskal, noted Plaintiff was having "minimal pain, mostly just tightness with therapy." *Id.* She was "still using [a] walker to ambulate". *Id.* Plaintiff stated her pain was 5/10, occurred "a few times a day", and occurred at night, with daily activities, and when exercising or walking. (Tr. 262). Plaintiff reported she was "thinking of applying for disability due to the fact that she is physically unable to stand at a bank teller position or perform medical assistant, which she was trained in." (Tr. 261). She also wanted to start driving. *Id.* Ms. Moskal noted Plaintiff's left knee range of motion was "much improved from last visit." *Id.* Ms. Moskal instructed Plaintiff to return in three months, and "discussed the use of NSAIDs in order to help with tightness and inflammation, particularly with therapy." *Id.* X-rays taken the same day showed small SI joint osteophytes bilaterally, mild offset and rotation at the level of the pubic symphysis. (Tr. 259). The right hip joint was maintained and there was "[n]o other significant abnormality." *Id.* The interpreting physician noted the x-ray showed "no significant change" since October 2013. *Id.*

In April 2014, Plaintiff returned to Dr. Joyce for follow-up. (Tr. 302-07, 312-13). Plaintiff reported left hip pain causing difficulty striding, as well as stiffness in the morning and after sitting or resting later in the day. (Tr. 302). She also reported moderate difficulty putting her socks on, and extreme difficulty with squatting, running, and twisting or pivoting. *Id.* A left hip x-ray taken that day showed no changes. (Tr. 300). Dr. Joyce observed Plaintiff had a "trendelenberg gait left"[1] and was using a cane (though she "[w]alked in office without cane"). (Tr. 312). Dr. Joyce noted films showed right knee tricompartmental osteoarthritis. *Id.* Plaintiff asked about bracing and an injection. *Id.* Plaintiff underwent an injection in her right knee, which provided pain relief in ten minutes, but no improvement in range of motion. *Id.* Dr. Joyce continued oxycodone. (Tr. 304).

Also in April 2014, Plaintiff underwent physical therapy at Cleveland Clinic Rehabilitation and Sports Therapy. (Tr. 342-44). She reported improvement in her right knee pain after the injection. (Tr. 342). The physical therapist observed Plaintiff's right knee was "straighter with ambulation and less valgus deformity" but she still had "mild Trendelenburg." (Tr. 343). She noted Plaintiff should "[c]ontinue with cane and can stop using when comfortable." *Id.* Plaintiff underwent a series of physical therapy exercises including seated bicycling for five minutes and ten minutes on a treadmill at two miles per hour. *Id.* The therapist assessed improved gait quality, and improved ability to climb steps, among other findings. *Id.* At her next visit, Plaintiff was using a cane, but was "[w]alking around the house without the cane". (Tr. 344). She again had a straighter right knee with ambulation and less valgus deformity, as well as mild Trendelenburg. *Id.* Exercises again included bicycling and treadmill. *Id.*

---

1. "Trendelenburg gait is defined as an abnormal, leaning gait occasioned by weakness in one lower extremity." *Mukes v. Comm'r of Soc. Sec.,* 946 F. Supp. 2d 737, 741 (S.D. Ohio 2013).

Plaintiff continued physical therapy in May 2014. (Tr. 345). She reported "doing more" and being on her feet more. *Id.* She rated herself as 90% improved in walking, rising from a chair, and home exercises. *Id.* She was still using a cane, and reported "feel[ing] not normal[,] not equal steps." (Tr. 346). The therapist recommended she continue to use the cane, and noted a positive Trendelenburg on the left with functional weakness in hip abduction. *Id.* Regarding stairs the therapist noted Plaintiff could "do step over step up with 1 rail. Down stairs needs rail assist to do reciprocal and not comfortable. Otherwise 1 step at a time." *Id.* At another visit that month, she reported left thigh soreness, but thought it was due to "just walking more without the cane around the house." (Tr. 349). The therapist noted Plaintiff had a less antalgic gait, less pain in the right knee, and a positive Trendelenburg. *Id.* She performed most exercises without the cane, but "[d]id use the cane to walk between exercises towards the end of sessions." *Id.* At her next visit, Plaintiff reported trying to walk more outdoors when the weather was nice, for up to 25 minutes at a time. (Tr. 350). Plaintiff "[d]id not use cane towards the end of sessions". (Tr. 351). At her final visit in May, Plaintiff reported doing exercises in a pool. (Tr. 352). Regarding Plaintiff's gait, the therapist observed: "when walks slow and hesitates[,] Trendelenburg more prevalent. When moving at a steady pace[,] less Trendelenburg." (Tr. 352). Exercises at each of these visits included bicycling and ten minutes on the treadmill. (Tr. 346, 349, 351, 352).

Plaintiff had two physical therapy visits in June 2014. (Tr. 354-58). Plaintiff had been going to the pool "a lot". (Tr. 354). She still had a limp. *Id.* She "[d]id not use cane to walk between exercises towards the end of sessions" and the therapist also noted "[i]ntermittent use of cane". *Id.* At her second June visit, Plaintiff reported doing exercises in the pool, and noted she felt 90% improved in sitting, and was "walking longer walks with cane outdoors". (Tr. 356). She could walk around her house without the cane, but it "increase[d] achiness." *Id.* The therapist noted Plaintiff

had achieved her goal of ascending and descending six inch steps with the use of a rail and her cane. (Tr. 358).

Plaintiff saw her physical therapist again in July 2014. (Tr. 359-60). Plaintiff reported increased pain after getting in a car. (Tr. 359). She thought she "just twisted it too much." *Id.* As a result she could no longer walk without the cane and was "putting more pressure on the cane". *Id.*

Plaintiff followed-up with Dr. Joyce the following day. (Tr. 323-26). She stated her condition was improving overall, but she had right buttock posterior pain for the past week. (Tr. 324). Plaintiff described "dull/aching" right knee pain that was 3/10 on "some days" with "daily activities". (Tr. 325). Plaintiff also answered "yes" to the question "Do you have serious difficulty walking or climbing stairs." (Tr. 326). An examination of Plaintiff's right knee showed mild valgus, patellofemoral crepitance, (Tr. 323). X-rays showed patellofemoral osteoarthritis on the right, and osteoarthritis and patellofemoral changes on the left. *Id.* X-rays of Plaintiff's left hip showed a subacute to chronic fracture through the femoral stem, but otherwise findings were unchanged. (Tr. 340). Dr. Joyce noted Trendelenburg, that Plaintiff "need[ed] [a] cane" and his impression was "no back pain, curvature and ner[]ve posterior ?sacarring [sic] or nerve root irritation." (Tr. 323). He suggested an anti-inflammatory. *Id.*

Plaintiff returned to physical therapy in July 2014, reporting Dr. Joyce had told her she pulled a muscle and a nerve. (Tr. 361). Plaintiff was eager to continue physical therapy and "get back to where [she] was and be able to walk without the cane." *Id.* The therapist observed Plaintiff was "[m]oving at a slower pace." *Id.*

In August 2014, Plaintiff reported her pain was 50% better overall, but she "still [could not] walk with out [sic] the cane", but was "trying short distances." (Tr. 365). The therapist noted "without cane still with Trendelenburg and valgus stress on right knee." *Id.* She also noted

Plaintiff's hip abduction was "still weak" and she needed "to continue to use cane to avoid Trendelenburg and stress to right knee." *Id.* At her next visit in August, Plaintiff reported she was 90% recovered from her sciatic pain flare up and 90% improved in her functional abilities. (Tr. 366). She, however, "still [could not] walk without the cane otherwise [her] hip [would] hurt more." *Id.* She also could not climb stairs without a rail. *Id.* The therapist noted a positive Trendelenburg with functional weakness in hip abduction. *Id.* Plaintiff underwent gait training and exercises. (Tr. 367). The therapist noted Plaintiff had the "capability to walk with improved gait, decreased list and Trendelenburg with a lot of effort and muscle fatigue." (Tr. 368). She instructed Plaintiff to "practice gait 10 minutes daily" and "continue to use cane other times." *Id.* At her final physical therapy session in August 2014, Plaintiff reported she had "really been working on [her] walking and [she] [could] feel the difference." (Tr. 369). She had left hip and right knee soreness, "mostly when . . . tired." *Id.* Plaintiff still had Trendelenburg. (Tr. 371). The therapist assessed that Plaintiff "continue[d] to improve with walking although it is still not natural and cannot tolerate more than 10 minutes of continuous walking . . . without rest." *Id.*

Plaintiff returned to Dr. Joyce in March 2015. (Tr. 384-85). She was "[o]verall doing fairly well with hip" but her right knee was painful. (Tr. 384). Dr. Joyce "[e]ncouraged her to use cane as to forceful thrust of hip." *Id.* Dr. Joyce reviewed "pelvis and hip films" taken that day, noting: "femoral and acetabular components appear fine –has claw with this causing some clinical irritation." (Tr. 385). Dr. Joyce thought a right total knee replacement could help, but Plaintiff stated she would think about it. *Id.* Plaintiff underwent a right knee injection, which provided pain relief in ten minutes, but no improvement in range of motion. *Id.*

In June 2015, Plaintiff returned to Dr. Joyce. (Tr. 391-95). She reported continued pain in her right knee, which was causing gait problems and impairing rehabilitation of her left hip. (Tr.

391). She reported the pain affected her sleep, ability to stand for prolonged periods, climb stairs, arise from a chair, and walk. *Id.* She also reported severe pain going up and down stairs, rising from bed, twisting/pivoting, kneeling, and squatting. (Tr. 395). On examination she had pain in her right knee with range of motion, valgus deformity, mild effusion, patellofemoral crepitus, and tenderness to palpation. (Tr. 391). Dr. Joyce noted "she is now using her cane to help because she is having instability issues." *Id.*; *see also* Tr. 395 ("No cane in office today – usually does use"). A hip x-ray was unchanged from prior films. (Tr. 392). X-rays of Plaintiff's knees showed degenerative changes in both knees, right greater than left. (Tr. 393). Dr. Joyce recommended surgical intervention, but Plaintiff did not want to pursue at that time due to family obligations. (Tr. 394). Plaintiff declined a cortisone injection because she had received minimal relief from the previous one. *Id.* Dr. Joyce recommended continued conservative treatment (rest, ice, compression and elevation), and refilled a prescription for oxycodone (noting Plaintiff only used it infrequently, once or twice per week). (Tr. 393).

At an August 2015 appointment for a physical with Dr. Dejak, Plaintiff reported she was waiting to hear about disability related to her left hip, was pending a right total knee replacement for knee osteoarthritis, and was doing some weight training for exercise. (Tr. 441).

*Opinion Evidence*

In March 2014, state agency physician Rannie Amiri, M.D., reviewed Plaintiff's records and opined Plaintiff could perform the physical requirements of light work with some additional postural and environmental limitations. (Tr. 85-87).

In July 2014, physician's assistant Ms. Moskal offered a functional assessment. (Tr. 324). She opined: 1) "[p]rolonged standing is not tolerated"; 2) "[s]tair climbing is normal w/ use of hand rail"; 3) "[w]alking is limited to 10 – 15 minutes duration with a cane and there is a slight

limp." *Id.* In her notes that day, Ms. Moskal indicated the "[p]hysical exam and assessment/plan were completed with Dr. Joyce." *Id.*

In August 2014, state agency physician Leon Hughes, M.D., reviewed Plaintiff's records and affirmed Dr. Amiri's conclusions. (Tr. 96-98)

In August 2015, Dr. Joyce completed a physical medical source statement. (Tr. 485-86). In it, he opined Plaintiff could lift ten pounds occasionally and three pounds frequently; stand and walk for up to two hours per day (fifteen minutes at a time); and sit for eight hours (without interruption) in an eight-hour workday. (Tr. 485). In support, he cited Plaintiff's left hip problems, which had caused secondary right knee osteoarthritis and "increased stress from compensation." *Id.* He opined Plaintiff could never climb, stoop, crouch, kneel, or crawl, and could rarely balance. *Id.* She could occasionally push and pull, and frequently reach or perform fine and gross manipulations. (Tr. 486). He opined Plaintiff should not be exposed to environmental hazards such as heights and moving machinery. *Id.* She had been prescribed a cane, and needed to be able to alternate positions between sitting, standing, and walking at will. *Id.* He opined Plaintiff experienced moderate pain, but the pain did not interfere with concentration, cause her to be off task, or cause absenteeism. *Id.* The final question on the form asked: "Does the individual require additional unscheduled rest periods during an 8 hour workday outside of a standard ½ [hour] lunch, and two 15 minute breaks?" *Id.* Dr. Joyce checked the "yes" box. *Id.* The next question asks: "If so, how much additional rest time would the individual require on an average day?" *Id.* Dr. Joyce wrote "2-4", and on the next line following the fill-in-the blank space, the form states: "hr". *Id.*

In December 2015, Dr. Joyce completed a second medical source statement. (Tr. 488-89). In it, he offered the same limitations as in his August statement, except he did not complete the

"postural activities" section. (Tr. 488). He also noted Plaintiff was scheduled to have knee surgery in January 2016. (Tr. 489).

<u>Hearing Testimony</u>

Plaintiff testified she was widowed, and lived in a single level condominium with her two children, ages eleven and twelve. (Tr. 37). Plaintiff had completed high school, and obtained an associate's degree in medical assisting. (Tr. 38).

Plaintiff testified she stopped working in July of 2013 due to hip pain. (Tr. 43) ("I was capable of doing stuff - - meaning, you know, sitting down, moving around more - - but then my knee totally - - left hip just - - I was in so much pain. I couldn't even walk or even sit down for a period of time."). Plaintiff underwent left hip replacement surgery. (Tr. 43-44). Plaintiff then developed problems with her right knee, and was scheduled to have a knee replacement the following week. (Tr. 44).

Plaintiff testified that, due to pain, she had to watch how she bends, cannot kneel, and cannot go up a flight of stairs. (Tr. 46-47); *see* Tr. 46 ("I have to hold on to the railings and go step by step."). Additionally, there were "things that [she would] do around the house for a few minutes and [she has] to sit down because [she is] in pain." (Tr. 47). Plaintiff stated she has to be cautious with her hip because of a risk of dislocation. (Tr. 46-47). Plaintiff testified to daily pain, which affected her sleep, and worsened with weather changes. (Tr. 51). Even after the hip replacement, she still had daily leg pain. (Tr. 63).

Plaintiff testified to wearing a brace on her right knee, and using a cane at all times. (Tr. 47-48). Plaintiff used the cane both for walking and for balance. (Tr. 66). She also testified she used a walker for year after her hip replacement. (Tr. 51-52).

Plaintiff estimated she could walk "[w]ith the cane . . . maybe 25 minutes to 30 minutes max." (Tr. 53). She stated that due to using the cane, she could not carry "much at all." *Id.* She did her grocery shopping with her mother or children, using a motorized cart. (Tr. 54, 58-59). She testified she could not kneel, crawl, crouch, and was limited in her ability to bend. (Tr. 54). She could get in and out of a chair to sit, and could get in and out of bed. (Tr. 54-55). She testified that due to her bending restrictions, her kids put her shoes and socks on for her. (Tr. 55). Plaintiff spent most of her time in a recliner with her legs elevated. (Tr. 56-57).

Plaintiff drove short distances, but her mother often drove her. (Tr. 37). Plaintiff attended parent-teacher conferences, and her children's soccer games. (Tr. 67). She could watch a soccer game by sitting and standing. (Tr. 68). She was able to dress herself and shower without assistance. (Tr. 57). Plaintiff estimated she spent one-and-a-half to two hours doing household chores on a typical day. (Tr. 58). Her mother helped. (Tr. 57). Plaintiff attended church weekly with her mother. (Tr. 59).

<u>VE Testimony</u>

A VE appeared and testified at the hearing before the ALJ. (Tr. 69-82). When asked to consider a hypothetical individual limited in the way ultimately found by the ALJ, the VE testified such an individual could perform past work, and other relevant work. (Tr. 72-79). When asked if an individual was required to be "off task 20 percent of a regular work day, exclusive of normal breaks and/or more than two days absent monthly, including tardies, arrivals, or early departures", the VE responded that such limitations "would exclude all work in the economy if it's an ongoing problem." (Tr. 79).

ALJ Decision

In his February 2, 2016 written decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019, and had not engaged in substantial gainful activity since her alleged onset date of July 29, 2013. (Tr. 18). He concluded Plaintiff had severe impairments of "left hip dysplasia status post total hip replacement, right knee affected from compensation for left hip, scheduled total right knee replacement on January 20, 2016." *Id.* He then found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, specifically considering Listing 1.02(A). (Tr. 19). The ALJ concluded Plaintiff had the residual functional capacity:

> [t]o perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally lift/carry ten pounds and lift/carry less than ten pounds frequently. She can sit for six hours and could sit/stand briefly for comfort while remaining on task. She can stand/walk no more than fifteen minutes at a time. The claimant uses a cane to ambulate and balance. She can walk for two hours in an eight-hour day. She can push/pull as much as she can lift/carry. She can occasionally operate foot controls, bilaterally and frequently use hand controls, bilaterally. She can frequently bilaterally, reach overhead and in all other directions. She can frequently handle and finger, bilaterally. The claimant can occasionally climb ramps and stairs and never climb ladders and scaffolds. She can occasionally balance and stoop and never kneel, crouch and crawl. She should never have exposure to unprotected heights, moving mechanical parts and operating a commercial motor vehicle.

*Id.* Based in the testimony of the VE, the ALJ then found Plaintiff was capable of performing her past relevant work as a mortgage loan processor and doctor's receptionist. (Tr. 24). The ALJ also alternatively found there were other jobs in the national economy Plaintiff could perform such as document specialist, food and beverage order clerk, and charge account clerk. (Tr. 24-25). Therefore, the ALJ found Plaintiff was not disabled. (Tr. 26).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### Standard for Disability

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

> 5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred in two ways: 1) in failing to find her impairments met Listing 1.02(A); and 2) in not adopting all restrictions opined by treating physician Dr. Joyce's opinion, despite assigning that opinion controlling weight. The Commissioner responds that the ALJ did not err, and substantial evidence supports his decision in both regards.

Listing 1.02(A)

Plaintiff contends the ALJ erred in finding she did not meet Listing 1.02(A). Specifically, she argues the ALJ erred in finding she could "ambulate effectively." The Commissioner responds that the ALJ's decision is supported by substantial evidence. The undersigned agrees with the Commissioner.

Plaintiff bears the burden at Step Three of establishing that her impairments meet or medically equal a listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 645 (2006). The Listing of

14

Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing," *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009), and all of these criteria must be met concurrently for a period of at least twelve continuous months. *See* 20 C.F.R. §§ 404.1525(c)(3)-(4), 404.1509; 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Here, to have met the criteria of Listing 1.02(A), Plaintiff had to establish that she suffers from major dysfunction of one or more joints, resulting from any cause, that is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P., App'x 1, Listing 1.02(A). As to the definition of "effective ambulation" referenced in 1.02(A), § 1.00(B)(2)(b) provides:

> b. What We Mean by Inability To Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b).

The ALJ here specifically considered Listing 1.02(A), but found "the record does not support a finding that the claimant is unable to ambulate effectively". (Tr. 19). He further explained:

> The claimant did have a total hip replacement in September 2013. After the hip surgery, the evidence showed the claimant could ambulate effectively without the use of a cane (Ex5F). The evidence did not support the claimant's assertion that she used a walker for twelve months (Ex5F). The claimant developed worsening right knee pain and then used the cane for ambulation. The claimant postponed having knee surgery (Ex6F). Nevertheless, the record showed that the claimant was walking effectively with the use of [a] cane (Ex5F).

*Id.* The parties dispute, in essence, whether the ALJ correctly determined Plaintiff could ambulate effectively, and therefore did not meet the requirements of the Listing. Plaintiff asserts the ALJ was incorrect in asserting she could "ambulate effectively without the use of a cane", and the records cited by the ALJ did not support this assertion. Plaintiff argues the ALJ cherry-picked the records, inappropriately relied upon Plaintiff's ability to ambulate in her house without the cane, and ignored the fact that Plaintiff's cane was medically necessary. Plaintiff relies heavily on the use of a cane as demonstrating her inability to ambulate effectively. The undersigned finds the ALJ did not err in this regard.

Exhibit 5F, cited by the ALJ in his Listing analysis consist primarily of physical therapy notes spanning April to August 2014. (Tr. 342-62, 364-71).[2] These notes show Plaintiff was primarily using a cane, though could at times walk around her house, or short distances without it (such as between exercises at physical therapy). *See* Tr. 344, 346, 351, 352, 354, 356. However, even assuming *arguendo* the ALJ was incorrect to state "the evidence showed the claimant could ambulate effectively without the use of a cane", he correctly stated "the record showed that the claimant was walking effectively with use of [a] cane." (Tr. 19).[3] Again, the inability to ambulate effectively is defined as an "extreme limitation in the ability to walk" such as "the inability to walk without the use of a walker, two crutches or two canes", or "the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a

---

2. In the midst of these records are notes from a single appointment with Dr. Dejak for an August 2014 physical. (Tr. 362-64).
3. For this reason, the undersigned finds it unnecessary to address Plaintiff's argument that the ALJ erred in finding the records did not support effective ambulation *without* the cane. Further, the undersigned finds not well-taken Plaintiff's argument that the ALJ "ignored the Listing's caveat that '[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.'" (Doc. 14, at 13) (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b)(2)). This is so because the undersigned finds the ALJ correctly determined Plaintiff was able to ambulate effectively *with* the cane.

reasonable pace with use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(1)-(2). Further, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) *that limits the functioning of both upper extremities*." *Id.* § 1.00(B)(2)(b)(1) (emphasis added).

Use of a single cane does not "limit the functioning of both upper extremities." *Id.* And, for this reason, district courts within this Circuit have consistently found that need to use a single cane does not establish an inability to walk effectively for the purposes of Listing 1.02(A). *See, e.g.*, *Sutton v. Berryhill*, 2017 WL 6568183, at *14 (N.D. Ohio) ("Courts have found that use of a single cane or crutch does not establish that a claimant is unable to ambulate effectively for purposes of meeting Listing 1.02.") (collecting cases), *report and recommendation adopted by* 2017 WL 6558165.

There was substantial evidence in the physical therapy notes cited by the ALJ to support the conclusion that Plaintiff could ambulate effectively *with* her cane. *See* Tr. 345 (Plaintiff's self-report that she was "90% improved [in] walking"); Tr. 350 ("Trying to walk more outdoors when weather is nice. 20-25 minute tolerance"); Tr. 356 ("walking longer walks with cane outdoors"); Tr. 369 ("I have really been working on my walking and I can feel the difference."); Tr. 370 ("continues to improve with walking although it is still not natural and cannot tolerate more than 10 minutes of continuous walking . . . without rest."); *see also* Tr. 343, 344, 346, 349, 351, 352 (physical therapy exercises included ten minutes on a treadmill).

Additionally, the ALJ's determination that there was no evidence to support Plaintiff's assertion that she used a walker for twelve months is also supported. *See* Tr. 52 (Plaintiff's testimony that she used a walker after her hip replacement "[f]or a year"); Tr. 225-27 (September

2013 hip replacement surgery); Tr. 261 (January 2014 notation that Plaintiff was "[s]till using walker to ambulate"); Tr. 312 (April 2014 notation that Plaintiff was "using cane" and "[w]alks in office without cane"). Plaintiff faults the ALJ for not mentioning the single notation to Plaintiff's use of a walker, but points to no further evidence that she used a walker for twelve months. *See* Doc. 13, at 13). Even resolving all assumptions in Plaintiff's favor and assuming she began using the walker immediately after her hip replacement in September 2013, the record evidence shows no affirmative evidence she was using it after January 2014, and, in fact, reflects affirmatively she was not using it as of April 2014.

Finally, Plaintiff has not shown limitations such as "the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(2). By contrast, Plaintiff testified that there are "a few stairs to get in the door" of her condo. (Tr. 37). And physical therapy notes establish the need for a handrail, but do not show such an inability to climb stairs with the use of such a hand rail. *See* Tr. 346, 358, 366.

Given the above, the undersigned finds the ALJ's determination that Plaintiff did not meet or equal Listing 1.02(A) supported by substantial evidence.

Treating Physician – Dr. Joyce

The ALJ summarized Dr. Joyce's August and December 2015 opinions, and then stated: "I give controlling weight to the opinions from Dr. Joyce since it was consistent with the probative evidence. As such, I have accounted for these limitations in the residual functional capacity set forth herein." (Tr. 23).

The form Dr. Joyce completed asked: "Does the individual require additional unscheduled rest periods during an 8 hour workday outside of a standard ½ [hour] lunch, and two 15 minute breaks?" (Tr. 486, 489). Dr. Joyce checked the "yes" box. *Id.* The next question asked: "If so, how

much additional rest time would the individual require on an average day?", with a fill-in-the-blank space, followed by the notation "hr" on the following line. *Id.* Dr. Joyce wrote "2-4" in the space provided. *Id.* Thus, read literally, and as Plaintiff reads it, Dr. Joyce opined Plaintiff would need an additional two to four *hours* of rest time during an eight-hour workday in addition to normal morning, afternoon, and lunch breaks. The ALJ, however, in summarizing Dr. Joyce's opinions, interpreted this to mean: "The claimant would require a rest every two to four hours during an eight-hour day in addition to normal scheduled breaks (Ex9F: 11F)." (Tr. 19). The Commissioner, relying on the ALJ's interpretation, states that "[w]orkers get normal breaks and meals every two hours, so under the ALJ's interpretation of the opinion, no additional limitations were required." (Doc. 15, at 18) (citing *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 730 (6th Cir. 2013) (citing SSR 96–9p, 61 Fed. Reg. 34478) (recognizing that an individual receives a morning break, a lunch period, and an afternoon break in approximately two hour intervals). . The undersigned would be tempted to accept this argument except for the fact that, regardless of whether the notation is interpreted to mean a break every two to four hours, or two to four hours of time spent resting, the form indicates, and Dr. Joyce opined, such breaks were "in addition to normal scheduled breaks". (Tr. 486, 489). Even under the ALJ's interpretation, therefore, Dr. Joyce's opinion contemplates breaks in addition to those cited by the Commissioner as typical. The RFC contains no restrictions regarding breaks.

Although the Commissioner's argument that this limitation was inconsistent with Dr. Joyce's contemporaneous opinion that Plaintiff could sit for eight hours uninterrupted in an eight-hour workday, *see* Tr. 485, 488, has strong logical appeal, this explanation was not advanced by the ALJ. Similarly, the Commissioner's argument that "[t]here is no explanation or justification in Dr. Joyce's treatment records or opinions to explain why Plaintiff would require two to four hours

of unscheduled rest periods during a day" (Doc. 15, at 19), might be supported by the record. But adopting either such analysis would be improper post-hoc rationalization because these explanations were not advanced by the ALJ. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency).

Thus, the undersigned finds that while the ALJ stated he gave Dr. Joyce's opinion "controlling weight", he neglected to include Dr. Joyce's limitation regarding additional rest breaks in the RFC. And he failed to explain his reasons for doing so. This is error.

On remand, the Commissioner should re-evaluate Dr. Joyce's opinion, specifically explaining the consideration given to this particular limitation.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses that decision and remands that decision pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

 s/James R. Knepp II
United States Magistrate Judge